UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
RONALD PEARSON, JOHN HOLDER,
and RICHARD WILLIAMS,               :

              Plaintiffs,           :

                                           **OPINION**
        - against -                 :
                                           02 Civ. 3629 (DC)
BOARD OF EDUCATION, CITY OF         :
NEW YORK, and DR. OMAR AYED,
                                    :
              Defendants.
                                    :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/13/2007

**APPEARANCES:**        RUDOLPH SILAS, ESQ.
                        Attorney for Plaintiffs
                        175 Remsen Street, Suite 602
                        Brooklyn, NY  11201

                        MICHAEL A. CARDOZO, ESQ.
                        Corporation Counsel for the City of New York
                        Attorneys for Defendants
                             By:  Jennaydra Clunis, Esq.
                        100 Church Street
                        New York, NY  10007

**CHIN, D.J.**

          In this case, plaintiffs Ronald Pearson, John Holder,

and Richard Williams, New York City public school teachers,

allege that their employers, the Board of Education (now the

Department of Education), the City of New York (collectively the

"City Defendants"), and Dr. Omar Ayed (plaintiffs' former

supervisor), retaliated against them in violation of their First

Amendment rights, violated their due process and equal protection

rights under the Fourteenth Amendment, created a hostile work

environment and discriminated against them in their employment on

the basis of race in violation of federal, state, and local law,

and retaliated against them in their employment after plaintiffs

complained of their treatment and filed formal grievances with governmental employment agencies.  Plaintiffs additionally allege defamation, intentional infliction of emotional distress, assault and battery, and wrongful hiring.

Ayed has never appeared in this action.  The City Defendants move for summary judgment on the remaining claims. Oral argument was held on June 18, 2007.  At argument I dismissed the defamation, intentional infliction of emotional distress, assault and battery, and wrongful hiring claims, and dismissed all claims against New York City Schools Chancellor Harold Levy. I reserved decision on the remaining claims.  For the reasons that follow, the motion is granted, and plaintiffs' remaining claims against Ayed are dismissed as well.

## BACKGROUND

**A.   Facts**

Construed in the light most favorable to plaintiffs, the nonmoving parties, the facts are as follows.

### 1.   The Parties

Pearson, Holder, and Williams were all licensed, tenured senior teachers in the Social Studies department of A. Philip Randolph High School (the "High School").  (McFarlane Dep. 21; Williams Decl. ¶ 2).  Pearson began working as a teacher at the High School in 1984, Holder in 1988, and Williams in 1981. (Compl. ¶¶ 8, 9, 12).  All three are African American.  (Williams Decl. ¶ 2).

Defendant Ayed joined the faculty of the High School in 1997 as an assistant principal and supervisor of the Social Studies department.  (Compl. ¶ 8).

    2.  **Pearson, Holder, and Williams's Employment at the High School**

        a.  **Evaluations and Performance**

At her deposition, former High School Principal Nathalie McFarlane[1] testified that she had never given any of the plaintiffs a negative employment evaluation.  (McFarlane Dep. 25).

Pearson attached to his declaration fourteen letters, written between 1988 and 1997, commending him for his teaching or thanking him for his participation in certain extra-curricular activities.  (Pearson Decl. Exs. 9-19, 21-23).  Pearson also submitted an evaluation completed by McFarlane on February 25, 1999, in which McFarlane concluded that Pearson's teaching was satisfactory.  (Id. Ex. 23).

Neither Holder nor Williams submitted any evaluation of work performance.  In their opposition to the motion, plaintiffs contend in their memorandum of law that "[u]pon information and belief Ayed and High School Principal Judith Butcher unfairly gave plaintiffs Pearson and Holder unsatisfactory evaluations in their final year at" the High School.  (Pl. Mem. of Law in Opp. 8).

---

[1]    McFarlane retired in 1999.  She was replaced by Judith Butcher.

###### b.   Use of Facilities

In December 1998, Holder and Pearson filed a grievance contending that Ayed was unfairly disallowing them access to a computer in the Social Studies office.  (Compl. Ex. 11; see Holder Dep. 40 (alleging that the African American teachers were not allowed to use the computer)).  This grievance was denied, because the computer had been purchased for the exclusive use of Social Studies supervisors, e.g., Ayed.  (Id.).

At her deposition, McFarlane stated that all teachers in the Social Studies department had access to the bookroom, regardless of their race, and that all teachers were also allowed to use the Social Studies office.  (McFarlane Dep. 100).

###### c.   Letters, Grievances and the OEO Investigation

Shortly after Ayed started working at the High School, his working relationship with Williams, Pearson, and Holder became strained, as memorialized in the grievances and formal and informal letters attached to the complaint in this case.  (Compl. Exs. 1-52).

Williams submitted the following objections to school or Department of Education officials:  (1) an October 21, 1998 letter to McFarlane, complaining that Ayed had referred to Vicky Meminger, another African American teacher in the Social Studies department, as "uncivilized," a comment Williams felt extended to him as an African American (id. Ex. 7); (2) a June 22, 1999 letter to Margaret Harrington, Chief Executive of School Programs/Support Services, concerning a visit by Complaint

Officer Scott Gale, wherein Gale allegedly told Holder, Pearson, Williams, and Meminger that their complaints about Ayed "had to stop" (id. Ex 41); and (3) a written allegation that Ayed had sexually harassed a female teacher at the High School.  (Id.).[2]

Pearson submitted the following documents concerning his experiences at the High School:  (1) an October 22, 1998 letter from Ayed concerning threats Pearson made to him (id. Ex. 8); (2) a letter from McFarlane denying Pearson's grievance of Ayed's observation of Pearson's class on November 9, 1998 (id. Ex. 13); (3) a Step II grievance adjudication denying Pearson's objection to the November 1998 observation (id. Ex. 14); (4) a December 1999 letter from Butcher sustaining Pearson's objection to Ayed's request that they meet alone in light of past circumstances (id. Ex. 29); (5) a letter dated June 12, 2000 from Butcher regarding the outcome of the Office of Equal Opportunity ("OEO") investigation of plaintiffs' complaints about Ayed, to which someone -- ostensibly Pearson -- added handwritten notations disagreeing with some of the substance; and (6) a letter from Butcher dated June 12, 2000, denying Pearson's grievance of the June 12th letter.  (Id. Ex. 48).

Letters and other communications to or from Holder include six Step II grievances, all of which were denied either in whole or substantially in part.  (Id. Exs. 6, 11, 12, 39, 46, 50).  There are also nine letters from Ayed criticizing Holder's

_____

[2]     This statement is dated March 28, 2000, but was notarized more than three years later, on May 8, 2003.  (Compl. Ex. 41; see infra).

performance as a teacher and employee in areas of timeliness, completion of assignments, and lesson-planning. (Id. Exs. 1, 4, 9, 15, 25, 31, 34, 44, 49). None of these letters contain any explicitly racial remarks. (Id.). Holder complained to the principal of the High School about many of these letters, and, with respect to some of them, escalated his objections to grievances and letters to Superintendent Granger B. Ward and Hearing Officer Robert Mastruzzi. (Id. Exs. 3, 9, 16, 19, 23, 27, 33, 34, 44, 49, 51).

Plaintiffs, together with Meminger, also filed several grievances that were ultimately denied, and composed letters to High School and Department officers regarding Ayed's allegedly discriminatory treatment of them. (See id. Exs. 17, 18, 20, 21, 22). As a result of these, on May 11, 1999, plaintiffs and Meminger were informed that their appeal of a Step II grievance regarding alleged disparate treatment by Ayed was being referred to the Office of Special Investigation, and that Ayed would not supervise the plaintiffs or Meminger until resolution of the investigation. (Id. Ex. 24). On June 24, 1999, plaintiffs and Meminger were informed that the investigation was being transferred to OEO. (Id. Ex. 25). On February 15, 2000, Stephen Mitchell, director of OEO, concluded that the discrimination claims made by the plaintiffs and "particularly, Mr. Pearson" were "without merit." (Id. Ex. 38, at 1).

Indeed, OEO determined that "these baseless complaints [by Pearson, Holder, Williams and Meminger] and the disruption

surrounding them have created a hostile work and education environment" at the High School.  (Id. at 1).  The OEO memorandum further states as follows:

> On February 10, [2000,] I received a fax from a faculty member who alleged that he was shoved in the back by Mr. Pearson.  In the past the same individual claimed he had been subjected to racial taunts and vandalism by Mr. Pearson.  We can neither confirm nor deny the veracity of his complaints.
> It appears that the complaint process has been used as a tool for harassment and intimidation by misguided faculty members. . . .
> . . . . [The complaining] individuals should not harass, intimidate coworkers, students and supervisors due to their perception that the filing of discrimination complaints absolves them of culpability for their actions.
> Therefore, I recommend that you issue a letter to all staff members advising them that adherence to rules, regulations, and proper conduct is one of the requirements for their continued employment at your school.  Mr. Pearson's conduct and actions are unacceptable and you should remove him from your school because he is the main contributor to the hostile work environment that currently exists.

(Id. at 1-2).

On March 28, 2000, Holder was informed by letter that Ayed's supervision would be re-instituted because the grievance had been resolved.  (Id. Ex. 40).  On March 30, 2000, Holder wrote to Angelo Reformato, the Arbitration Advocate for the teachers' union, United Federation of Teachers ("UFT"), expressing his belief that the OEO investigation consisted of "tenuous and fabricated 'findings'" and that the investigation was "flawed," and advocating arbitration.  (Id. Ex. 42).

- 7 -

### d.  **Other Incidents**

As memorialized in his October 21, 1998 letter to McFarlane (see supra), on that date Williams heard Ayed repeatedly say to Meminger that she was "uncivilized."  (Id. Ex. 7; see Williams Decl. ¶ 9).  In the letter to McFarlane, Williams further stated that "[i]t is a tragic irony that Black Americans have had to deal with being called 'uncivilized' for 400 years in this country, and that in a school in Harlem a Black American woman can be called uncivilized as we move into the 21st century!"  (Compl. Ex. 7).  Williams contended that "in the past few years," Ayed had subjected him to "personal and professional disparagement," including the following comments:  (1) "'Only the single, unmarried ones are complaining'"; (2) Williams "'received "preferential" treatment' [affirmative action]" (bracket in original); and (3) "'uncivilized.'"  (Id.).

Holder contends that on April 10, 2000, Ayed elbowed him as he attempted to enter Holder's classroom, and in doing so Ayed "physically assaulted" Holder.  (See id. ¶ 69 & Ex. 45).  Holder called the police and filed a complaint.  (Id. Ex. 43).  He also filed a notice of claim, wherein he alleged that Ayed "violently and without any justification physically assaulted [him] by punching him in his chest."  (Id.).[3]  Holder grieved

---

[3]    Holder failed, however, to file suit within one year and ninety days of the incident, as required by New York law.  See N.Y. Gen. Mun. Law § 50-i ("[T]he action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based.").  Accordingly, this claim is barred.

this incident, but during the grievance hearing he refused to identify another teacher he claimed had witnessed the alleged altercation.  (See id. Ex. 45).  As part of her investigation Butcher randomly selected four students from Holder's class and interviewed them about what had occurred.  (Id.).  Her findings did not support Holder's claims, and the grievance was denied. (Id.).  At her deposition, Butcher testified that neither Ayed nor Holder was reprimanded for this incident, although Butcher did inform Holder that she preferred that he notify her before calling the police to the High School.  (Butcher Dep. 41-42).

### 3.  **Per Session Money**

"Per session" money is pay earned by New York City teachers for overtime hours worked outside of normal teaching time.  (Tr. 8).[4]  Per session activities are advertised for a specific number of hours for a specific amount of time, and per session hours are assigned to applicants based on seniority. (McFarlane Dep. 103).  Per session payments are not permitted for certain activities, including grading the Regents Exam.  (See id. at 32 (McFarlane explaining that it would be "illegal" for a teacher to receive per session money for grading Regents Exams)).

On June 17, 1998, McFarlane wrote to Pearson about his contention that he had not been reimbursed for per session hours of tutoring.  (Pearson Decl. Ex. 8).  The letter advises as follows:

---

[4]    Citations to "Tr." are to the transcript of the oral argument held before this Court on June 18, 2007.

> [S]ince the posting and instructions
> regarding tutoring were ambiguous and
> unclear, you should be compensated for the
> tutoring sessions you provided for students.
> It was agreed that you would submit time
> sheets for those days that you provided
> tutoring and for which you were not
> compensated before the end of June, 1998.

(Id.).  The record does not indicate whether Pearson ever
submitted time sheets, and, if so, whether he was paid for his
time.

McFarlane also issued a memorandum regarding tutoring
and per session money dated October 16, 1998.  (Winefsky Decl.
Ex. I).  This memo states, inter alia, that all per session
activities must be pre-approved and time sheets submitted to
receive payment.  (Id.).  The same day, Williams wrote to
McFarlane and requested a meeting to discuss per session money,
saying in particular that he "was not . . . treated in an
equitable fashion in regards to per session hours for tutoring
during the Spring 1998 semester."  (Id. Ex. J).  There are some
handwritten comments on this letter, and the handwritten date
November 6, 1998.  (Id.).  These comments state in part that
"Williams never requested per session hours for tutoring in the
Spring 1998 semester even though he was requested to submit time
sheets."  (Id.).  When asked at his deposition if his issues with
the per session money were ever resolved, Williams stated:  "It
was resolved by several teachers who felt it wasn't worth
fighting for. . . . [F]or me it was never resolved . . . . I'm
not taking part payment for what the school acknowledges should
be full payment and whites are given full payment."  (Williams
Dep. 35).

### 4.   Requests for Leave of Absence and Resignations

The UFT contract with the City of New York and the Department of Education provides that teachers may be granted a leave of absence without pay, as follows:  "Teachers may be granted a leave of absence without pay of up to two years to adjust personal affairs (such as the winding up of a family business on the death or incapacitation of the family member in charge) in accordance with existing rules and regulations." (Holder Decl. Ex. H-5).  The contract further states that "[t]hrough at least July 31, 1995, the [Department] will implement a liberal policy concerning the granting of leaves of absence without pay to UFT bargaining unit members who meet the stated criteria for such leaves."  (Id.).

On September 12, 2000, Pearson requested an unpaid leave of absence from the High School effective September 7, 2000, through June 27, 2001.  (Pearson Decl. Ex. 1; Pls.' Ex. S-11).  In addition to the form, he also submitted a one-page letter stating his reasons for requesting the leave of absence. (Pearson Decl. Ex. 2; Pls.' Ex. S-11).  This letter stated, inter alia, that Pearson was requesting a leave of absence because of "racism and disparate treatment," that Ayed "operates the [Social Studies] department like a southern plantation," and that Pearson felt he needed to "step back and wait for this racist and sexual predator," Ayed, "to self destruct."  (Pearson Decl. Ex. 2).  In this letter Pearson further contended that he had been called a "Black Nigger," but did not specify by whom, when, or any other circumstances.  (Id.).

Pearson's request for a leave of absence was denied by letter on October 3, 2000.  The letter stated:

> If the applicant does not plan to continue in service, the member should contact the Teacher's Retirement System or a UFT pension consultant in order to protect any retirement benefits available.  After receiving retirement information from either of the above, the applicant should submit, if applicable, the attached resignation form to the Office of the Superintendent of Manhattan High Schools at the address below.

(Id. Ex. 4).  On October 11, 2000, Pearson received a letter from W.L. Sawyer, Superintendent of Manhattan High Schools, instructing him to report to his job within five days of receipt of the letter or be considered to have abandoned his position. (Id. Ex. 5).  Pearson resigned on October 17, 2000.  (Id. Ex. 6). Pearson gave the following reason:  "Racist harassment by Dr. Ayed of [the High School] and Sawyer's failure to protect my 14th Amendment Due Process and Equal Protection rights under the U.S. Constitution."  (Id.).

On September 6, 2000, Holder applied for an unpaid leave of absence effective September 4 or 5, 2000, through September 4 or 5, 2001, for the purpose of "adjustment of personal affairs."  (Holder Decl. Ex. H-1; Pl.'s Ex. S-12). Holder attached a one page handwritten note to this request, addressed to Butcher.  (Winefsky Decl. Ex. G).  This document states as follows:  "I am requesting a leave of absence for the period 9/4/2000 -- 9/4/2001 due to 'adjustment of personal affairs.'"  (Id.).  The director of personnel, Min Choi, requested that Holder clarify the reasons behind his request for

a leave of absence.  (Holder Decl. Ex. H-3).  In a letter dated
September 19, 2000, Holder stated that he was requesting the
leave of absence because Holder had "brought numerous [complaints
about] episodes of negligence, malfeasance, incompetence, and
gross improper behavior . . . by Dr. Omar Ayed."  (Id. Ex. H-2).
Because of these complaints, Holder contended, he had "been
subjected to a sustained discriminatory and hostile work
environment."  (Id.).  Holder further stated that Ayed's
"animosity" toward him was "tacit[ly] approved" by Butcher, and
that the "animosity" included "disparate treatment, retaliation,
and intimidation," which "culminated when" Ayed "deliberately
assaulted [Holder]" in April 2000.  (Id.).

          Holder's request for a leave of absence was also
denied, and he received substantially the same letter as Pearson.
(Id. Ex. H-6).  Additionally, on October 11, 2000, Holder
received a letter substantially similar to the letter Pearson
received ordering him to report to work or forfeit his position.
(Id. Ex. H-7).  Holder resigned, using a resignation form dated
October 6, 2000.  (Id. Ex. H-8).  Holder attached a statement of
the "Cause of Resignation," which reads as follows:

          Failure of the Office of the Superintendent
          of Manhattan High Schools and the Board of
          Education (NYC) to protect my 14th Amendment
          Rights, including personal assault and
          battery, by my immediate supervisor, Dr. Omar
          Ayed, Assistant Principal; and denial of my
          application for a leave of absence without
          pay, despite clearly stated and legitimate
          reasons.

(Id.).  In his declaration in support of his opposition to
defendants' motion for summary judgment, with respect to his

resignation Holder states as follows:  "I could no longer endure
the hostile work environment at [the High School] under the
supervision of Ayed, nor could I afford to be deemed to have
abandoned my position.  I therefore tendered my resignation on
October 6, 2000."  (Holder Decl. ¶ 10).

        In their memorandum of law in opposition to the motion,
Pearson and Holder contend that the stated reasons for the
denials of their requests for leaves of absence were "merely
pretext for the defendants['] real motive which was to force
plaintiffs out of" the High School.  (Pl. Mem. of Law in Opp.
15).

    **5.**    **Sexual Harassment Allegations Against Ayed**

        On November 30, 1999, Holder wrote to Butcher about "an
incident that occurred in the office of the Department of Social
Studies" on November 23, 1999, wherein Holder observed Ayed and
an unidentified female engaging in "friendly conversation,"
"reviewing (picture) snapshots, laughing, and holding hands
together."  (Compl. Ex. 28) (parentheses in original).  No
follow-up correspondence has been submitted to the Court relating
to this allegation.

        On January 7, 2000, Holder wrote to Butcher to inform
her of an incident that occurred the previous day.  (Id. Ex. 30).
He recounted that his students had brought to his attention that
Ayed, at his desk in the Social Studies office, was viewing
"moving images of young girls scantily attired" on the computer.
(Id.).  Holder attached two letters of observation from students,

neither of which have been submitted to the Court.  (Id.).  On January 19, 2000, Holder wrote to Edward F. Stancik, Special Commissioner of Investigation for the New York City School District, attaching his January 7th letter, and referring to "numerous documented statements of sexual malfeasance involving female students and female staff."  (Id. Ex. 32).

Attached to his complaint, Williams submitted a document titled "Statement," dated March 28, 2000, and notarized on May 8, 2003.  (Id. Ex. 41).  This statement reads in part:

> [A female teacher] informed me in the presence of [another teacher] that assistant principal Dr. Omar Ayed did the following [to her]:  " . . . he touched me in places that he shouldn't have . . . he stood behind me and pressed his body against mine and I turned and looked at him . . . he did it again and I told him to stop . . . he was eating chocolate cake and tried putting the cake in my mouth" . . . . She went on to say: '. . . he always treats me mean and thought that he can use his supervision to get what he wants from me in a personal way."
> As a member of the United Federation of Teachers Chapter's Executive Committee I am forward[ing] this statement.

(Id.).

Pearson also alleges that he reported some of these incidents because he was a "mandated reporter," as are all teachers.  (Pearson Dep. 60, 80; see McFarlane Dep. 94 ("Q:  Was there a policy in place, a mandated reporting type policy, concerning allegations of sexual abuse?  A:  Yes. . . . You had to report it to the superintendent.")).

In October 2001, Ayed met with a union representative and Joan E. Perez, Deputy Superintendent of Manhattan high

- 15 -

schools, to discuss allegations of his inappropriate sexual comments to and behavior with students and other teachers. (See Pls.' Ex. S-7). Following this meeting, in a letter to Ayed dated October 26, 2001, Perez concluded that the allegations of "inappropriate touching, improper comments and sexual harassment" had been substantiated. (Id.). Ayed's services as a supervisor were terminated immediately, and at some subsequent time his employment with the New York City school system was terminated entirely. (Id.; Tr. 16-17).

### 6. **Alleged Discriminatory Conduct**

Holder contends that Ayed, motivated by racial animus, wrote up him and the other African American teachers in his department for "minor or minute" infractions, whereas white teachers would not be written up for similar conduct. (Holder Dep. 34). When asked at his deposition "to give an example as to another teacher [Ayed] didn't write up where he wrote [Holder] up," Holder replied as follows: "[Ayed] complained I was late for my class four or five minutes. This became a big deal, which I also grieved it by the way." (Id.). Holder did not give any example of another teacher who was not written up for a similar infraction, or indeed any example of any white teacher being written up or not written up.

Williams alleges that in 1999 Ayed denied him use of the Social Studies office and computer, while allowing unnamed white and "non-American born" teachers to use them. (Williams Dep. 20; Williams Decl. ¶ 6). Williams also alleges that white

teachers were allowed free access to the locked Social Studies bookroom, whereas he had to ask Ayed for the key to access it at all times, although the time of this is unspecified.  (Williams Decl. ¶ 7).

Williams claims that Mastruzzi referred to him and the other African American Social Studies department teachers as "'aweful (sic), terrible,' etc.," and that "'everyone' kn[ew] about" them.  (Id. ¶ 11).  Williams does not indicate when, where, or under what circumstances this statement was made.  (See id.).

Williams also contends that Ayed characterized him as a "thief" and as being "out of control," and that these were "racially profiled stereotypes," but does not recall specifically when these characterizations occurred.  (Williams Dep. 20-21 ("[H]e made an accusation that I was a thief, and he also made the accusation that I was acting out of control.  His language was not only damaging and pejorative, but he also made references to African-Americans being uncivilized.")).  Williams further alleges that at Social Studies department meetings Ayed referred to "them," meaning the African American Social Studies teachers, and that there was a "separation between the African-American staff . . . and the non-African-American staff."  (Id. at 27-28).  This "separation" -- between himself, Pearson, Holder, and Meminger (African American teachers), and John Armetta, Lisa Hicks, Dr. Samad, Ms. Gaspar, Mr. Libutsi, and Mr. Pugh (non-African American teachers) -- was a distinction between those

teachers who would be supervised by Ayed and those who would not, apparently pursuant to the OEO investigation. (Id. at 29-30). In their memorandum of law in opposition to the motion to dismiss, plaintiffs additionally "allege a continuous stream of . . . remarks" that created a hostile work environment, although plaintiffs do not state what these remarks were, who made the remarks, to whom they were made, or when they were made. (Pl. Mem. of Law in Opp. 13).

Williams further contends that, instead of investigating his complaints, the OEO letter "attacked" him, and "stated that [he] should be dealt with and not listened to if [he] continue[d] to complain." (Williams Decl. ¶ 15). Indeed, Williams considered the OEO letter to be "in retaliation for [his] letter complaining about . . . Scott Gale and [his] [l]etters complaining to . . . Harrington." (Id. ¶ 16).

Pearson contends that the placement of the OEO letter in his file by Butcher constitutes racial discrimination, because it bears "no rational relationship to anything." (Pearson Dep. 49). He further contends that he was retaliated against by Sawyer, superintendent of schools, because "none of [their] grievances were ever ruled in [plaintiffs'] favor." (Id. at 106-07).

Williams and Pearson also contend that Ayed inappropriately discussed grievance proceedings at Social Studies faculty meetings. (Williams Decl. ¶ 8; Pearson Dep. 81-82). Williams alleges that this "stereotyped [him] as a troublemaker,"

and that other teachers at the High School were told at some unstated time by McFarlane, Butcher, and Ayed that Williams was a "troublemaker." (Williams Decl. ¶¶ 8, 13). Likewise, Pearson contends that Ayed's discussion of grievances at faculty meetings constituted retaliation. (Pearson Dep. 81).

Additionally, in his declaration, Williams states as follows: "In June 2001 I received retaliation for accompanying [a female teacher] to the United States Equal Opportunity Office at the World Trade Center and speaking with Special Agent Mr. Ricardo Jones. [The female teacher] was filing a complaint regarding [s]exual harassment by [s]upervisor, assistant principal Omar Ayed." (Williams Decl. ¶ 18). Williams does not state what the retaliation was. (See id.). Williams contends that he previously "received retaliation" in May 2001 for accompanying the female teacher to speak with the New York City Department of Investigations regarding sexual harassment, although here he also does not indicate what form the retaliation took. (Id. ¶ 19).

With respect to per session money, Williams contends he was denied payment for overtime work he performed between 1997 and 1999. (Id. ¶ 3). Williams claims that white teachers were not denied this money, and had only to give an oral report that they had worked overtime to receive payment. (Williams Dep. 32-33; Williams Decl. ¶ 3). Williams alleges that in 1998 he was denied approximately $2,500 to $3,000. (Williams Decl. ¶ 4). Additionally, Williams alleges that, at some point, his letters

- 19 -

complaining of disparate treatment resulted in him being
retaliated against, in that he was not paid per session money to
grade the Regents Exams, while white teachers were paid for this.
(Id. ¶ 17).  Williams contends that there was no public
notification that this overtime would be available, and that the
white teachers who were permitted to grade the Regents Exams
received about ten to twenty hours of per session money for this
activity.  (Id.).

        Finally, in his declaration, Pearson contends that
"denial of the use of school computers, access to the bookroom
for educational materials, discussion of . . . contract
grievances in department meetings, and the use of racial
preference to deny African-American teachers per session pay for
tutoring students were all adverse employment actions."  (Pearson
Decl. ¶ 11).

## B.   **Procedural History**

        On June 28, 2001, Pearson filed a charge with the New
York State Division of Human Rights (the "State Division") and
the Equal Opportunity Employment Commission (the "EEOC"),
alleging that he had been discriminated against on the basis of
race, and retaliated against.  (Winefsky Decl. Ex. O).  Pearson
claimed that he was constructively discharged from the High
School, and retaliated against for complaining about Ayed.
(Id.).  Pearson alleges that this retaliation included his and

- 20 -

the other plaintiffs' grievances being denied.  (Pearson Dep.
106-07, 119).[5]

On July 5, 2001, Holder filed a charge with the State
Division and the EEOC, alleging that he had been discriminated
against on the basis of race, and retaliated against.  (Winefsky
Decl. Ex. N).

On July 26, 2001, Williams filed an EEOC charge,
alleging that he had been discriminated against on the bases of
race, color, and his whistleblower status, and that he had been
retaliated against.  (Id. Ex. M).

Plaintiffs filed their complaint in this action on May
10, 2002, and the case was assigned to Judge Richard C. Casey.
In their complaint, plaintiffs made the following claims:
retaliation under the First Amendment for speaking out against
Ayed's alleged sexual harassment under 42 U.S.C. § 1981;
violation of plaintiffs' due process rights under the Fourteenth
Amendment, in violation of 42 U.S.C. § 1983; violation of
plaintiffs' equal protection rights under the Fourteenth
Amendment; creation of a hostile work environment,
discrimination, and retaliation for plaintiffs' complaints about
their employment in violation of Title VII; defamation;
intentional infliction of emotional distress; wrongful discharge;

---

[5]     In his deposition, Pearson also referenced a "memo"
apparently drafted by Williams memorializing a meeting attended
by plaintiffs and Mitchell of OEO.  At this meeting, Pearson
contends, Mitchell "bragged [that] he could deny anybody their
rights and gave examples."  (Pearson Dep. 120).  No such memo has
been submitted to the Court.

assault and battery; and wrongful hiring and retention of Ayed.
Initially, plaintiffs brought these claims against the Department
of Education, the City of New York, Ayed, Butcher, McFarlane,
Sawyer, Ward, Mastruzzi, Mitchell, and Levy.

On November 26, 2003, New York City Corporation
Counsel, acting as attorneys for all defendants except Ayed,
moved to dismiss the claims against the individually named
defendants.  On October 12, 2004, the Court dismissed all claims
against defendants Mastruzzi, Mitchell, Sawyer, Ward, Butcher,
and McFarlane.

On May 27, 2005, the Court held a pre-motion
conference.  Ayed made no appearance at this proceeding, and
Judge Casey instructed plaintiffs to send Ayed a certified letter
directing him to respond within thirty days, or the Court would
consider entering a default judgment against him.  No request for
default judgment was ever made, nor is it clear that any
certified letter was ever sent to Ayed.

On August 19, 2005, the City Defendants filed this
motion for summary judgment.

On May 17, 2007, this case was reassigned to the
undersigned.  On June 18, 2007, I held argument on the summary
judgment motion.  At argument, I dismissed plaintiffs' claims for
defamation, intentional infliction of emotional distress, assault
and battery, and wrongful hiring of Ayed as a matter of law.  I
also dismissed all claims against Levy, and I reserved decision
on the remaining claims.

For the reasons set forth below, the motion is granted as to the remaining claims as well, and all claims against Ayed are dismissed.

## DISCUSSION

Plaintiffs have used a "kitchen sink" approach to pleading -- including numerous claims as well as some claims that overlap or are essentially the same claim articulated under different legal rubrics.  While I address each of the remaining claims, claims that ought to be addressed under one standard are so grouped.

### A.    Summary Judgment Standard

The standards governing motions for summary judgment are well-settled.  A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law.  See Fed R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor.  See id.

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475

U.S. at 586.  As the U.S. Supreme Court stated in <u>Anderson</u>, "[i]f
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S.
at 249-50 (citations omitted).  The nonmoving party may not rest
upon mere conclusory allegations or denials, but must set forth
"concrete particulars" showing that a trial is needed.  <u>Nat'l
Union Fire Ins. Co. v. Deloach</u>, 708 F. Supp. 1371, 1379 (S.D.N.Y.
1989) (quoting <u>R.G. Group, Inc. v. Horn & Hardart Co.</u>, 751 F.2d
69, 77 (2d Cir. 1984) (internal quotations omitted)).
Accordingly, it is insufficient for a party opposing summary
judgment "merely to assert a conclusion without supplying
supporting arguments or facts." <u>BellSouth Telecomms., Inc. v.
W.R. Grace & Co.</u>, 77 F.3d 603, 615 (2d Cir. 1996) (quotations
omitted).

**B.    <u>First Amendment Claim</u>**

In their first cause of action, plaintiffs claim that
they were harassed and retaliated against in their employment for
speaking out against Ayed's racially discriminatory practices.
Additionally, plaintiffs contend that white teachers at the High
School were not harassed or retaliated against for speech acts.
While included under the rubric of the First Amendment, these
claims are more properly considered below, as part of plaintiffs'
employment discrimination allegations.

Holder and Pearson also contend in the first cause of
action that they were forced to resign, and that all three
plaintiffs were harassed, in retaliation for their complaints

about Ayed's allegedly sexually inappropriate behavior with students and other faculty members.  This is a First Amendment claim, but it is dismissed for the following reasons.

1.   **Applicable Law**

To establish that defendants violated plaintiffs' First Amendment speech rights, plaintiffs must establish that (1) the speech at issue was protected; (2) they suffered an adverse employment action; and (3) there was a causal connection between the protected speech and the adverse employment action.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-85 (1977); Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003) (holding that speech must be "at least a substantial or motivating factor in the discharge" (quotations omitted)); see 42 U.S.C. § 1981.

"A State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  Connick v. Meyers, 461 U.S. 138, 142 (1983).  "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006).

A court must apply a two-part test to establish whether an employee's speech is protected by the First Amendment.  Id. at 1958.  The U.S. Supreme Court recently clarified the applicable test in Garcetti:  A court must first "determin[e] whether the employee spoke as a citizen on a matter of public concern.  If

the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id.  If the employee spoke as a citizen, the court must move to the second part of the test, questioning "whether the relevant government entity has an adequate justification for treating the employee differently from any other member of the general public."  Id.; see Benvenisti v. City of N.Y., No. 04 Civ. 3166 (JGK), 2006 WL 2777274, at *7 (Sept. 23, 2006) ("First, the Court must determine whether the plaintiff was speaking as a 'citizen' for First Amendment purposes.").

In Garcetti, the Court determined that the "controlling factor" was not that the employee expressed his views inside his office or that the subject matter of his expression was his employment, but rather whether the employee's "expressions were made pursuant to his duties" of employment.  Garcetti, 126 S. Ct. at 1959.  The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."  Id. at 1960; Benvenisti, 2006 WL 2777274, at *8.

## 2.  **Application**

In their complaint, plaintiffs contend that they "individually and collectively, in their capacity, as teachers and pursuant to mandate, complained of Dr. Ayed's predatori[a]l misconduct and unprofessionalism" relating to Ayed's alleged sexual misconduct toward female students and staff.  (Compl. ¶¶ 26-27).  As a result, plaintiffs allege, they were harassed

and/or forced to resign in violation of their First Amendment rights.

In light of the Supreme Court's ruling in <u>Garcetti</u>, this claim must fail, as plaintiffs have affirmatively pled that the statements they made with respect to Ayed's allegedly inappropriate sexual conduct were made "pursuant to their official duties." <u>Garcetti</u>, 126 S. Ct. at 1960.  Accordingly, this claim is dismissed.

## C.   <u>Due Process</u>

In their second cause of action, plaintiffs contend that the defendants "conspired to force" Ayed's supervision upon the High School and plaintiffs and conducted faulty investigations of Ayed's performance and behavior resulting in plaintiffs' wrongful termination in violation of their due process rights.  (Compl. ¶¶ 96-100).

To the extent this claim alleges a violation of plaintiffs' due process rights because Ayed was made a supervisor when he should not have been, this claim is not cognizable. There is no due process right in having, or not having, a particular supervisor, and plaintiffs have cited no authority for such a right.  Accordingly, this portion of the second cause of action is dismissed.

To the extent the second cause of action alleges employment discrimination, this claim is considered below.

## D.   <u>Equal Protection</u>

In their third cause of action, plaintiffs contend they suffered a violation of their Fourteenth Amendment Equal

Protection rights, in that their grievances were not properly addressed.  As an initial matter, the Court observes that plaintiffs do not articulate what protected class they inhabit for Equal Protection purposes, but reading the pleadings as a whole, the Court assumes that plaintiffs are alleging Equal Protection violations based on their race.  In any event, to the extent that this allegation relates to plaintiffs' employment claims, it is discussed below; otherwise, plaintiffs' claims for violation of their Equal Protection rights are dismissed.

**E.   Employment Discrimination**

Plaintiffs bring three types of employment discrimination claims:  hostile work environment, disparate treatment, and retaliation.  As an initial matter, the City Defendants allege that many of plaintiffs' claims are time-barred.  I discuss this procedural barrier to plaintiffs' claims and then each type of alleged employment discrimination in turn.

**1.   Limitations Period**

A prerequisite to the filing of a federal civil action under Title VII is the timely filing of a charge of discrimination with the EEOC.  Harris v. City of New York, 186 F.3d 243, 247-48 (2d Cir. 1999) (disability case applying Title VII).  Where, as here, the alleged acts of discrimination occur in a state that has its own anti-discrimination laws and a state agency is empowered to enforce the laws, the charge of discrimination must be filed with the EEOC within 300 days after the date of the alleged unlawful acts.  42 U.S.C. § 2000e-5(e)

(statute's time limits cover acts of discrimination as well as acts of retaliation for complaints of discrimination); Harris, 186 F.3d at 247 n.2.  The 300-day period starts to run when the claimant receives notice of the allegedly discriminatory conduct, not when the allegedly discriminatory decision takes effect. Delaware State Coll. v. Ricks, 449 U.S. 250, 258 (1980); DeSalvo v. Metro. Opera Ass'n, No. 96 Civ. 8292 (DC), 1997 WL 337517, at *2 (S.D.N.Y. June 19, 1997), aff'd, 162 F.3d 1147 (2d Cir. 1998); see also Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 23 (2d Cir. 1985) (limitations period begins to run "on the date when the employee receives a definite notice of the termination").

Discriminatory acts occurring before the 300-day charging period may be saved from time bar by the "continuing violation" doctrine, which offers one means by which plaintiffs can assert otherwise time-barred acts, as "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Miller, 755 F.2d at 25.  The continuing violation doctrine applies if a plaintiff has experienced a continuous policy of discrimination. Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001).  If satisfied, the continuing violation doctrine allows a plaintiff "to bring suit challenging all conduct that was a part of that [continuing] violation, even conduct that occurred outside the limitations period." Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994). To demonstrate that the doctrine applies, the plaintiff is required to show that the related acts were the result of a

discriminatory policy rather than isolated instances of
discrimination.  Fitzgerald, 251 F.3d at 359; Cornwell, 23 F.3d
at 704.  It is well-settled that "multiple incidents of
discrimination, even similar ones, that are not the result of a
discriminatory policy or mechanism do not amount to a continuing
violation."  Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.
1993); see Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101,
114-15 (2002).  Likewise, in the context of a hostile work
environment claim, because

> the incidents constituting a hostile work
> environment are part of one unlawful
> employment practice, the employer may be
> liable for all acts that are part of this
> single claim. . . . [F]or the charge to be
> timely, the employee need only file a charge
> within 180 or 300 days of any act that is
> part of the hostile work environment.

Morgan, 536 U.S. at 118.

In Morgan, the Supreme Court further limited the
circumstances under which the continuing violation doctrine may
save an otherwise time-barred act.  Distinguishing between
discrete discriminatory acts and ongoing violations such as
hostile work environment claims, Morgan, 536 U.S. at 113-16, the
Court held that discrete acts "are not actionable if time barred,
even when they are related to acts alleged in timely filed
charges.  Each discrete discriminatory act starts a new clock for
filing charges alleging that act . . . . Each incident of
discrimination and each retaliatory adverse employment decision
constitutes a separate actionable 'unlawful employment
practice.'"  Id. at 113-14.  The Court reasoned that "[d]iscrete

- 30 -

acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." Id. at 114; see Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2169-70 (2007) ("The EEOC charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.  But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.").

        Pearson filed his charge with New York State and the EEOC on June 28, 2001; accordingly, any claims predicated on discrete acts occurring before September 1, 2000, and not forming part of a hostile work environment claim, must be dismissed. Holder filed his charge on July 5, 2001, and likewise any claims based on incidents occurring before September 29, 2000 must be dismissed.  Williams filed his charge on July 26, 2001; therefore any claims derived from incidents occurring before September 29, 2000 must be dismissed.  See Harris, 186 F.3d at 247 n.2.

        At oral argument, plaintiffs' counsel conceded that the only claims clearly available to Holder and Pearson are the hostile work environment and the denial of leave of absence claims.  (Tr. 5).  Plaintiffs' counsel contended, however, that all three plaintiffs might also make a claim for denial of per session money, because although plaintiffs made those requests

- 31 -

prior to the 300-day EEOC charging period, the denial of per session money constitutes a continuing denial of a right, and is therefore saved under the continuing violation doctrine.  (Id. at 6).

Plaintiffs' argument about the per session money betrays their misreading of the continuing violation doctrine. The last documented request for per session money was made in 1998.  (See Pearson Decl. Ex. 8; Winefsky Decl. Ex. J).  No plaintiff alleges to have attempted to claim per session money after that date; indeed, Williams testified at his deposition that he no longer attempted to obtain per session money. (Williams Dep. 35 ("I'm not taking part payment for what the school acknowledges should be full payment.")).  No plaintiff brought a discrimination claim within the applicable charging period relating to any purported 1998 denial of per session money, plaintiffs have not alleged that any discriminatory denial of per session money did occur within the charging period, and plaintiffs have failed to produce any evidence of a discriminatory policy.  See Ledbetter, 127 S. Ct. at 2169-70; Fitzgerald, 251 F.3d at 359; Cornwell, 23 F.3d at 704. Accordingly, the only non-time barred claims are for hostile work environment and the denials of unpaid leaves of absence.

## 2.  **Hostile Work Environment**

For the reasons set forth below, plaintiffs have failed to present evidence from which a reasonable jury could find a racially hostile work environment.

a.  **Applicable Law**

A hostile work environment claim has two aspects:  A plaintiff must show (1) harassment sufficiently severe and pervasive so as to alter the conditions of his employment, and (2) the conduct was motivated by plaintiff's membership in a protected class.

As to the first element, "a plaintiff must . . . show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (internal quotations and citations omitted); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (to defeat a summary judgment motion on a claim of racially hostile work environment, "a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment") (internal quotation marks omitted).

The misconduct must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Additionally, the plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996).

A single incident will not suffice unless "extraordinarily severe." Cruz, 202 F.3d at 570 (quotation omitted).  Further, as the Second Circuit stated in Patterson v. County of Oneida:

> The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

375 F.3d 206, 227 (2d Cir. 2004) (quoting Harris, 510 U.S. at 21, 23).  Additionally, "where reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law."  Id.

Second, a hostile work environment claim under Title VII requires a showing that the conduct occurred because of plaintiff's membership in a protected class.  See Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).  Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII.  This statute prohibits discrimination, and is not a civility code.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

On a motion for summary judgment, the nonmoving party "must present concrete particulars and cannot succeed with purely

- 34 -

conclusory allegations." <u>Cadle Co. v. Newhouse</u>, No. 01 Civ. 1777
(DC), 2002 WL 1888716, at *4 (S.D.N.Y. Aug. 16, 2002) (internal
quotation marks omitted); <u>see also</u> <u>Cameron v. Cmty. Aid for
Retarded Children, Inc.</u>, 335 F.3d 60, 63 (2d Cir.2003) (finding
"[p]urely conclusory allegations of discrimination" insufficient
to defeat summary judgment motion).  "Personal speculation is
insufficient as a matter of law to raise an inference of
discrimination." <u>Boise v. New York Univ.</u>, No. 03 Civ. 5862
(RWS), 2005 WL 2899853, at *4 (S.D.N.Y. Nov.3, 2005).

### b.  **Application**

Here, although plaintiffs allege abusive conduct, they
fail to present the requisite "concrete particulars," and rely
instead on conclusory allegations and personal speculation.  As
to the first showing required in a hostile work environment
claim, plaintiffs have arguably alleged pervasive conduct.  As to
the second required showing, however, although plaintiffs
subjectively felt that the conduct was based on their race, they
have not made a sufficient objective showing.  Accordingly, I
conclude that no reasonable jury could find that plaintiffs were
subjected to a racially hostile work environment.

The only evidence plaintiffs have offered in support of
their claim that the conduct was based on race is that they are
African American.

They have also offered their belief that remarks that
were negative but facially race-neutral were actually racial

remarks, and their perception that they were treated differently from white teachers.

With respect to the alleged remarks, plaintiffs essentially allege five negative remarks:  Ayed called another African American teacher "uncivilized" in Williams's presence, Ayed told Williams that he was a "thief" and "out of control," Mastruzzi stated that plaintiffs and Meminger were "terrible," and at some time Ayed and both High School Principals stated that Pearson was a "troublemaker."  These are not race-based remarks, and no reasonable jury could conclude in the circumstances here that they were.

Williams contends that Ayed calling another teacher "uncivilized" in his presence was "the same as if [Ayed] said to her, 'You're a nigger,' and if I'm standing there and I'm of the same race, I must obviously be a nigger, as well.  And that's how I interpret it."  (Williams Dep. 25).  While I assume, as I must, that this was Williams's subjective interpretation of that event, no reasonable jury could concur that Ayed's calling another African-American teacher uncivilized in Williams's presence is the equivalent of using a racial epithet against Williams or anyone else.  These other proffered incidents of name-calling -- Ayed purportedly calling Williams a "thief" and "out of control," Mastruzzi stating that all plaintiffs were "terrible," and Ayed and others stating that Pearson was a "troublemaker" -- also simply do not evidence racial animus.  Without more, and in light of the circumstances, these simply are not a basis for a hostile work environment claim.

Williams also alleges that Ayed stated that Williams had received preferential treatment, implying, Williams believed, that Williams had benefitted from affirmative action. Although this is arguably some evidence of racial animus, under all the circumstances this one remark is insufficient to warrant a trial. While Pearson contends that he was called a "black nigger" at some unstated time by an unstated person, this is a mere allegation lacking in any concrete particulars, and therefore insufficient to even assist in carrying Pearson's claim past summary judgment. Finally, plaintiffs' additional allegation in their memorandum of law in opposition to the motion for summary judgment that there was a "continuous stream of . . . remarks" is woefully insufficient at the summary judgment stage. Discovery has long since closed, and plaintiffs should be presenting evidence, not making conclusory allegations unsupported by stated facts.

Although plaintiffs allege that they were treated differently than white or "non-American" teachers, they have produced nothing further to support their claim of a hostile work environment. For example, they have failed even to produce any information about the racial make up of the school, or more than cursory information about the racial make up of the Social Studies department.[6] Indeed, at the oral argument in June 2007, I had the following colloquy with plaintiffs' counsel.

---

[6] Plaintiffs' claims of disparate treatment are further discussed below.

> THE COURT:    It sounds like the only
> evidence that you have that this was race
> based is that the four black teachers were
> subjected to this conduct, and the nonblack
> teachers were not.
>
> PL. COUNSEL:   That's correct.
>
> . . . .
>
> THE COURT:    Is that enough to survive
> summary judgment? . . . You have to show and
> a reasonable jury has to be able to find that
> the bad conduct was because of race.
>
> PL. COUNSEL:   It strains the mind to come up
> with any other reason why [Ayed] would have
> wanted to treat [the plaintiffs] this
> way. . . . I have to concede that there was
> nothing that I know of, Dr. Ayed ever
> referring to them in the pejorative . . . .
> Aside from that, his conduct spoke for
> itself, but I do not have anything further in
> terms of comments than what I have said.

(Tr. 14-15).  This is not enough to survive summary judgment.

While I assume, as I must, that plaintiffs subjectively perceived the environment to be abusive, see Faragher, 524 U.S. at 787, they have produced no evidence to show that any conduct rose to the level of "harassment [that] was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" based on race. Feingold, 366 F.3d at 149.  Plaintiffs have cited one instance of an actual racial epithet but failed to say when or by whom it was spoken, one arguably racial remark, and have otherwise cited only five negative but facially neutral remarks.  Plaintiffs have not cited any other conduct that evidences a workplace "permeated with discriminatory intimidation, ridicule, and insult" motivated by racial animus.  Cruz, 202 F.3d at 570 (quotations and citations omitted).

- 38 -

Obviously plaintiffs were very unhappy in their workplace, but Title VII is not a civility code, see Oncale, 523 U.S. at 81, and in fact it does not "strain the mind to come up with any other reason," aside from racial animus, for the conduct plaintiffs complain of, or even for the existence of a hostile work environment at the High School.  In light of all the materials presented to this Court, including the absence of any substantial, concrete evidence of discrimination, a reasonable jury could only conclude that the OEO letter was accurate. Despite Pearson's contention that the letter bears "no rational relationship to anything" (Pearson Dep. 49), in fact it accurately recounts plaintiffs' overreaction to the circumstances of their employment.  The most egregious overreaction occurred when Holder, in response to a minor physical incident that was not substantiated by an investigation, called 911.  (See Compl. ¶ 69 & Exs. 43, 45).  Stripped of their hyperbole and adjectives contending racial animus and discrimination, plaintiffs complain of unannounced observations of their classes, discussions of personnel matters at departmental meetings, required documentation to receive overtime pay, and disciplinary actions for lateness and other employment infractions.  Plaintiffs' response to these events simply was not reasonable.

For the above reasons, plaintiffs have failed to produce "concrete particulars" to show that a trial is needed. Nat'l Union Fire Ins. Co., 708 F. Supp. at 1379 (quoting R.G. Group, Inc., 751 F.2d at 77 (internal quotations omitted)).  No

reasonable jury could conclude that plaintiffs were subjected to a hostile work environment based on race.  Accordingly, plaintiffs' claim for hostile work environment is dismissed.

### 3.  **Disparate Treatment**

For the reasons set forth below, plaintiffs' claim for disparate treatment in the conditions of their employment must be dismissed.

#### a.  **McDonnell Douglas Framework**

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000); Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir. 1997).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework for federal discrimination claims set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and a plaintiff in an employment discrimination case usually relies on the three-step McDonnell Douglas test.  First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected class (2) who performed his job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of

discrimination.  See McDonnell Douglas, 411 U.S. at 802, 802 n.13

(noting that elements of prima facie case vary depending on

factual circumstances); Stratton v. Dep't for the Aging, 132 F.3d

869, 879 (2d Cir. 1997) (in age discrimination case, discussing

reformulation of McDonnell Douglas framework).

        An adverse employment action is a "materially adverse

change in the terms and conditions of employment." Galabya v.

N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)

(internal quotation omitted).  "'To be materially adverse' a

change in working conditions must be 'more disruptive than a mere

inconvenience or an alteration of job responsibilities.'"  Id.

(quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132,

136 (7th Cir. 1993)).  An adverse employment action is not

defined "solely in terms of job termination or reduced wages and

benefits[.] . . . [L]ess flagrant reprisals by employers may

indeed be adverse." Wanamaker v. Columbian Rope Co., 108 F.3d

462, 466 (2d Cir. 1997).  A materially adverse change may be

indicated by a termination of employment; a demotion with a

decrease in wage or salary or a less distinguished title; a

material loss of benefits; significantly diminished material

responsibilities; or other indices unique to a particular

situation.  Galabya, 202 F.3d at 640; see Johnson v. Eastchester

Union Free Sch. Dist., 211 F. Supp. 2d 514, 517-18 (S.D.N.Y.

2002).  There are no bright-line rules in applying this standard.

Johnson, 211 F. Supp. 2d at 518.  "Whether a particular

reassignment is materially adverse depends upon the circumstances

of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2417 (2006) (quotations omitted).

If the plaintiff establishes a prima facie case of unlawful discrimination, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." Stratton, 132 F.3d at 879; see Reeves, 530 U.S. at 142-43.

If the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993) (citation omitted); see James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. See Fields, 115 F.3d at 120-21; Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-101 (2003); Harris v. City of New York, No. 03 Civ. 6167 (DLC), 2004 WL 2943101, at *2 (S.D.N.Y. Dec. 21,

2004).  It is not sufficient, however, for a plaintiff merely to show that he satisfies "McDonnell Douglas's minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." James, 233 F.3d at 157.  Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination.  See id.; Connell, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in James, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove -- particularly discrimination."  233 F.3d at 157; see Lapsley v. Columbia Univ., 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of McDonnell Douglas test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); see also Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases.  In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

The McDonnell Douglas framework also applies, in general, to state and local discrimination claims.  See Abdu-

Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.
2001); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir.
2000); Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d
689, 707 (S.D.N.Y. 2003); Landwehr v. Grey Adver., Inc., 622
N.Y.S.2d 17, 18 (1st Dep't 1995).  Accordingly, I discuss the
Title VII, state, and local discrimination claims together.

### b.  **Application**

I assume for purposes of this motion that plaintiffs
have made a prima facie showing of race discrimination required
by McDonnell Douglas.  The City Defendants have met their burden
of articulating non-discriminatory reasons for their employment
actions and decisions, as they have offered non-discriminatory
explanations for their employment decisions.  See Stratton, 132
F.3d at 879; see also Reeves 530 U.S. at 142-43.  Simply put, the
City Defendants contend that (1) they denied Holder and Pearson
paid leaves of absence because they did not adequately explain
the reasons underlying their requests as required; and even
assuming these claims are not time-barred, (2) all plaintiffs
were denied per session money because they either did not apply
for it, or failed to properly document their eligible activities.

Accordingly, I proceed directly to the ultimate
question of whether plaintiffs have presented sufficient evidence
from which a reasonable jury could find that they were
discriminated against because of their race.  I do so by
evaluating first plaintiffs' evidence, then the City Defendants'
evidence, and finally the record as a whole, keeping in mind the

elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole."  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 314 (2d Cir. 1997); see also Siano v. Haber, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), aff'd mem., 201 F.3d 432 (2d Cir. 1999).

### 1.   Plaintiffs' Evidence

Plaintiffs purport to offer the following in support of their race discrimination claim:  their race, African American; one racial epithet; several comments, as discussed above; and their perception that they were treated differently from white teachers.

For the reasons discussed above, the remarks simply do not raise a sufficient inference of discrimination to warrant a trial.

Likewise, plaintiffs have not produced concrete evidence that white teachers were treated better than they were, or even that white teachers were treated differently than they were.  Plaintiffs have not produced any evidence of how white teachers were treated at all.  They have merely alleged that they were treated differently, and, indeed, the only time the non-African American teachers are even mentioned by name is in Williams's deposition, when he discusses the alleged "separation" between the African American and the non-African American Social Studies teachers.  (Williams Dep. 27-30).

After years of litigation, plaintiffs have produced nothing more.

## 2. <u>Defendants' Evidence</u>

Defendants offer the following evidence in support of their motion for summary judgment.

With respect to the claims that the City and/or the Department of Education discriminated against plaintiffs Holder and Pearson in denying their requests for unpaid leaves of absence, the City Defendants have contended that plaintiffs did not submit reasons for the requested leaves of absence, as required. (<u>See</u> Choi Decl. ¶ 4 ("I denied plaintiffs' requests for unpaid leave of absence because they did not follow procedures provided for on the . . . form.")). Plaintiffs, however, did submit documents that explain their requests, documents that they purport to have submitted either contemporaneously with, or shortly after, their initial requests. (<u>See</u> Holder Decl. Ex. H-3; Pl.'s Ex. S-11). What defendants seem to mean is that although plaintiffs offered reasons, defendants did not consider these reasons sufficient. Indeed, the reasons advanced by plaintiffs were reasons that the City Defendants could not reasonably have been expected to accept -- plaintiffs claimed they needed time off because the Social Studies department was run like a "southern plantation" and they had been subjected to "a sustained discriminatory and hostile work environment." (<u>See</u> Pearson Decl. Ex. 2; Holder Decl. Ex. H-2). Granting their requests for a leave under these circumstances would have been tantamount to an admission of discrimination.

With respect to plaintiffs' claims regarding the per session money, City Defendants primarily contend that these

claims are time barred.  Assuming they are not, however, the City
Defendants have also presented evidence that (1) plaintiffs could
not get per session money for certain activities, including
grading the Regents Exam (see McFarlane Dep. 103); (2) all
teachers had to document their per session time (see Winefsky
Decl. Ex. I); and (3) when per session procedures were not clear,
plaintiffs were allowed an opportunity to retroactively submit
claims for unpaid per session money.  (See id. Ex. J; Pearson
Decl. Ex. 8).

### 3. **The Record As a Whole**

Examining the record as a whole, and resolving all
conflicts in evidence and drawing all reasonable inferences in
plaintiffs' favor, I conclude that no reasonable jury could find
in favor of plaintiffs on their disparate treatment claims.

Plaintiffs have not met their burden of proving that
the City Defendants' actions were motived at least in part by
discriminatory intent, as the only proof of discrimination they
have presented is that they are African American and other Social
Studies department teachers are not, and one comment that
Williams received "preferential treatment."  See Reeves, 530 U.S.
at 146.  This is weak evidence of discrimination.  See Pullin v.
Potter, No. 01 Civ. 2641 (DC), 2003 WL 1907203, at *4 (S.D.N.Y.
Apr. 18, 2003) (granting summary judgment when plaintiff's only
evidence in support of age discrimination was "the mere fact that
he was in the protected age category").

With respect to the leaves of absence, the City
Defendants' proffered explanation -- that plaintiffs did not

adequately explain their requests -- is arguably pre-textual in light of the documents submitted by plaintiffs, as plaintiffs did offer reasons (albeit reasons the City Defendants could not reasonably have been expected to accept).  (See Holder Decl. Ex H-3; Pl.'s Ex. S-11).  As the Second Circuit has stated, however, merely showing pretext is not enough; a Court must ask, "pretext for what?"  Fisher v. Vassar Coll., 114 F.3d 1332, 1337 (2d Cir. 1997), abrogated on other grounds, Reeves, 530 U.S. at 147-48.  The Second Circuit further observed as follows:

> In some cases, an employer's proffered reason
> is a mask for unlawful discrimination.  But
> discrimination does not lurk behind every
> inaccurate statement.  Individual
> decision-makers may intentionally dissemble
> in order to hide a reason that is
> non-discriminatory but unbecoming or
> small-minded, such as back-scratching,
> log-rolling, horse-trading, institutional
> politics, envy, nepotism, spite, or personal
> hostility.

Fisher, 114 F.3d at 1337.  Indeed, "the fact that the proffered reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff."  Id.  Even assuming the City Defendants' reason is pre-textual or even simply false, based on the facts presented a reasonable jury could not find that the City Defendants actions were motivated by racial discrimination.[7]  In fact, given the manner in which the requests

---

[7]     Indeed, plaintiffs do not actually contend that City Defendants' actions were pretext for racial animus -- rather, they merely contend that "defendants['] real motive . . . was to force plaintiffs out of" the High School.  (See Pl. Mem. of Law in Opp. 13-15).  This may have been the case, but it is not necessarily an allegation of racial discrimination.

were framed, the City Defendants had no real alternative but to
deny the requests.  Additionally, plaintiffs Holder and Pearson
rely on the UFT contract with the City of New York, as stated in
their declarations, seeming to imply that the unpaid leaves
should have been liberally granted but were not, evidencing
discrimination.  (See Holder Decl. ¶ 10; Pearson Decl. ¶ 7).
This reading is incorrect, as the "liberal" policy was only in
place at least until 1995, five years before plaintiffs requested
their leave.  (See Holder Decl. Ex. H-5).  Plaintiffs have
produced nothing to suggest that this liberal policy was still in
place at the time they sought to take advantage of it.

        With respect to the per session money (assuming these
claims are not time-barred), the City Defendants have offered
evidence that plaintiffs did not comply with the proper
procedures to obtain per session money, and plaintiffs, in
response, have merely alleged that this was based on race and
provided nothing more to support their claims.  As stated above,
conclusory allegations will not suffice to survive summary
judgment, and plaintiffs have accordingly failed to meet their
burden under the McDonnell Douglas test.

        Examining the record as a whole, I conclude that a
reasonable jury could not find that plaintiffs were discriminated
against on the basis of race.  Accordingly, plaintiffs' claims
for disparate treatment in the circumstances of their employment
are dismissed.

### 4. **Retaliation**

Finally, plaintiffs' claim for retaliation must be dismissed.

#### a. **Applicable Law**

Title VII prohibits an employer from firing an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); see also N.Y. Exec. Law § 296(1)(e). Thus, Title VII's "participation clause" protects participation in a proceeding under Title VII. See Deravin v. Kerik, 335 F.3d 195, 203 n.6 (2d Cir. 2003). Further, "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal citations omitted).

To establish a prima facie case of retaliatory discharge, plaintiffs must show that (1) they were engaged in protected activity; (2) the City Defendants were aware of that activity; (3) plaintiffs suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the termination or suspension. Id.; see Nakis v. Potter, 422 F. Supp. 2d 398, 418 (S.D.N.Y. 2006). A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the

defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).

Although the burden that a plaintiff must meet at the prima facie stage is de minimis, plaintiffs must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995).

### b. **Application**

As an initial matter, any claims alleging retaliation for plaintiffs' letters of complaint and grievances to the High School and/or the Department of Education are time-barred, because none of this activity occurred within 300 days prior to their filing the EEOC charges. See 42 U.S.C. § 2000e-5. In his EEOC charge, Holder alleges that Ayed's "assault" of him on April 10, 2000, constituted retaliation, but this claim is clearly time-barred. (Winefsky Decl. Ex. N). In any event, to the extent that plaintiffs allege, for example, that placement of the OEO letter in their files constituted retaliation, no reasonable jury could so conclude. Plaintiffs instigated that proceeding, and no reasonable jury could conclude that placing the findings of the investigation into plaintiffs' personnel files was improper. Any claims for retaliation relating to plaintiffs' internal complaints are dismissed.

Holder and Pearson filed their charges of discrimination in late June and early July 2001. (See id. Exs.

O, N).  The only arguably adverse employment actions falling
within the 300-day charging period are the denials of leaves of
absence in October 2000, <u>before</u> they filed the charges.  (<u>See</u>
Holder Decl. Ex. H-7; Pearson Decl. Ex. 6).  Both Holder and
Pearson seem to allude to this conduct in their EEOC charges,
albeit without specificity.  (<u>See</u> Winefsky Decl. Exs. O, N).  In
light of the nature of the requests and the reasons given, and as
discussed above, no reasonable jury could conclude that the
denials were retaliatory, because they occurred before the
protected activity.  Accordingly, Holder and Pearson's claims of
retaliation must be dismissed.

        Williams's EEOC charge, while it does contain an
allegation that he was retaliated against, does not state what
the retaliation was or was for.  (Winefsky Decl. Ex. M).  In any
event, Williams does contend that he engaged in a protected
activity:  Accompanying the female teacher to the EEOC office,
where she complained of sexual harassment from Ayed.
(<u>See</u> Williams Decl. ¶ 19).  He fails, however, to indicate what
form this retaliation took, or to provide any evidence concerning
this incident beyond the bare statement in his declaration.  His
claims concerning denial of the per session money arose in 1998
(<u>see</u> Winefsky Decl. Exs. I, J; Williams Dep. 35), years before
Williams engaged in the protected activity.  Furthermore, the
Court has been presented with no evidence that Williams has
suffered any other even arguably adverse employment action,
following either this incident or his July 2001 complaint about

race discrimination to the EEOC.  At most, Williams has presented merely conclusory allegations lacking concrete particulars.  This is not enough to defeat summary judgment.  See Cameron, 335 F.3d at 63; Boise, 2005 WL 2899853, at *4; Cadle Co., 2002 WL 1888716, at *4.  Accordingly, this claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the City Defendants' motion for summary judgment is granted.

This case was filed in 2002, based primarily on events that occurred in 1999 and 2000.  Plaintiffs, unhappy with their school's choice of a supervisor, embarked on a campaign of complaints and grievances.  In whole or in part, these complaints and grievances were meritless and often were a gross overreaction to perceived slights and indignities.  Plaintiffs apparently concluded, as OEO found, that they could "harass [and] intimidate coworkers, students and supervisors," believing that "the filing of discrimination complaints absolve[d] them of culpability for their actions."  (See Compl. Ex. 38).  When their complaints, grievances, and harassment were unsuccessful, these disgruntled employees brought suit in this Court, seeking $60 million in damages.  (See id. at 22-23).  After five years of litigation, and a great expenditure of city and judicial resources, these allegations, which were no more supported at the summary judgment stage than they were at the initial filing of the complaint, are dismissed for a wholesale lack of merit.

Finally, I hereby dismiss all claims against Ayed. Although he has never appeared in this action, plaintiffs were instructed by Judge Casey in 2005 to inform him of the suit by certified letter, and to file a motion for a default judgment if he failed to respond.  Plaintiffs never filed their motion. Accordingly, this claim is dismissed for failure to prosecute. Moreover, plaintiffs' claims against Ayed are deficient for the same reasons as stated above with respect to their claims against the other defendants.

The Clerk of the Court shall enter judgment dismissing the complaint with prejudice and with costs, and the Clerk shall close this case.

SO ORDERED.

Dated:     New York, New York
           August 10, 2007

DENNY CHIN
United States District Judge